ASMUSSEN, Appellant

v.

SCHMIDT, Commissioner of Revenue et al., Respondents

(202 N.W.2d 857)

(File Nos. 11182-11187. Opinion filed December 8, 1972)

Donald J. Porter, of Martens, Goldsmith, May, Porter & Adam, Pierre, for plaintiff-appellant, Thomas S. Asmussen.

Keith A. Tidball, Pierre, for defendant, George Chamales.

John Dewell, Asst. Atty. Gen., Pierre, for defendant, Lowell Schmidt, Commissioner of Revenue of the State of S. D.

Charles Poches, Jr., Fort Pierre, for defendants-cross-appellants, G. E. Kelso and F. M. McDaniels, Jr.

RENTTO, Associate Judge.*

Plaintiff Asmussen on December 14, 1971 applied to the City of Pierre for a license to sell intoxicating liquors on-sale. Notice of this was published and after a hearing his application was approved by the Board of Commissioners of the city, and forwarded to the defendant Commissioner of Revenue. On January 13, 1972, the Commissioner returned the application to the city without action, stating it was in excess of the quota of such licenses authorized by law for the City of Pierre.

---

* Retired Supreme Court Judge acting by appointment pursuant to SDCL 16-8-13.

He commenced this action on February 16, 1972 against the Commissioner for declaratory relief. During its pendency the others were added as defendants. They are persons whose applications for the same kind of license had been approved by the city and honored by the Commissioner. The matter was presented to the court on a written stipulation of facts entered into by all the parties. This made superfluous the findings of fact and conclusions of law appearing in the record. SDCL 15-6-52(b) states that findings of fact and conclusions are waived "by entering into a stipulation of facts for consideration by the court."

By its judgment the court determined that the Commissioner properly refused to act on Asmussen's application and that the granting of an on-sale license to Chamales was valid. It also held that the issuance of a license to Kelso and McDaniels was invalid. Asmussen appeals from the portion of the judgment unfavorable to him and Kelso and McDaniels from the part of it adverse to them. We will first consider the appeal of Asmussen.

In April 1971 Chamales applied to the City of Pierre for a Class Q intoxicating liquor license, generally referred to as a bottle club license. This type of operation had been authorized by Chap. 206, Laws of 1970. The city approved his application and the Commissioner on June 7, 1971, granted the license. The place where he proposed to operate his bottle club was designated as 312 West Sioux in Pierre. These premises consisted of three vacant lots. For this reason the Commissioner retained the license in his office until local requirements relative to his premises had been satisfied. Apparently Chamales was then proposing to build a restaurant and lounge building at the designated site.

In December 1970 he engaged local architects to design such facility, and about a year later contracts for its construction were awarded. Incidentally, no permit to build it had been issued when this matter was presented to the trial court. On October 29, 1971, he filed an application with the city to sell intoxicating liquor on-sale on the same premises for which his Q license had been issued. This application the city approved and sent to the Commissioner. On December 15, 1971, he granted the license applied for and delivered it to the applicant. Five months later it

came to his attenton that the proposed premises were not in existence, so he requested the license be returned to him, to be held until the contemplated premises were in compliance with statutory requirements. The license was returned to the Commissioner and is presently in his possession.

During 1971 Kelso and McDaniels had a license authorizing them to sell intoxicating liquor on-sale. Under it they operated the 406 Club Lounge and Bar at 406 South Pierre Street. On November 16 of that year they made application to the City of Pierre for a similar license for the year 1972 covering the same premises. Notice of this application was given and a hearing had thereon. The city on December 7, 1971, denied their application for the reason that they were not suitable persons to hold such licenses. Their application and check were returned to them on December 10, 1971.

On December 14, 1971, Asmussen applied to the city for a license to sell intoxicating liquor on-sale. The premises on which he proposed to operate as such licensee were the same as those in which Kelso and McDaniels had operated the 406 Club in 1971 and had been planning to operate in 1972. At a hearing held after notice the city prior to December 31, 1971 approved his application. This was the application the Commissioner declined to honor because the quota had been exhausted. The record does not reveal what possessory interest Asmussen had in the premises where he proposed to operate.

After the described denial of their application by the city on December 7, 1971, Kelso and McDaniels on December 30, 1971, executed an instrument which they denominated an Escrow Agreement. In it they designated themselves as holders of a 1971 on-sale liquor license and applicants for a 1972 license. It directed the Commissioner to forward their 1972 license to the City Auditor if their application was approved by him. At that time they had no application pending. They further agreed in the escrow not to operate under the 1972 license and authorized the City Auditor to hold it until the City Commission of Pierre approved the transfer of it to a party and a location agreed upon by the Commission.

Their escrow was supplemented by a written contract dated March 23, 1972 by which they sold and assigned to a third party, not Asmussen, their interest in the 406 Club and their 1972 on-sale liquor license, if it was granted. They further agreed to proceed under the Bulk Sales Law to effectuate the sale and execute all instruments required to carry out the agreed transfer. The escrow agreement was made a part of the contract. Whether a license applied for may be anticipatorily assigned in this manner we need not, and do not, determine. It was not questioned. See SDCL 35-2-7.

About a month later their former application which had been denied was delivered to the city along with the contract and a new check in payment of the required fee. On May 2, 1972, the Commission considered their applications and approved it "subject to the conditions of the contract attached thereto." No Notice of this hearing was given. On May 25 the Commissioner issued the license applied for but in line with the policy of his department held it until local requirements relative to health, safety, fire and other standards had been met.

The 46th session of our legislature rewrote the alcoholic beverage laws. Chap. 211, Laws of 1971. One section of it fixed the maximum number of on-sale licenses that a municipality may approve. This appears as SDCL 35-4-11. So far as here pertinent it provides:

> "The number of on-sale licenses issued shall not exceed three each and for the first one thousand of population and not exceed one each of such licenses for each additional one thousand of population or fraction thereof, provided, however, the number of such licenses shall not exceed the total number of such licenses allowable or issued prior to July 1, 1971."

Under the population limitation 12 licenses were permissible in Pierre, but under the second phrase only 11 were allowable. Obviously the latter is controlling.

The parties are in agreement that when the Commissioner refused to award Asmussen a license, eleven had been granted in

the City of Pierre. One of these was the Chamales on-sale license. To bring the license sought by him within the quota allowable, Asmussen contends that the Chamales license should not be charged against the quota. He initially argues that only legally issued licenses should be considered in such determination and urges that it does not qualify as such because the premises involved were not in existence and the license is not an "issued" one while it is being held by the Commissioner.

■ It is a matter of common knowledge that persons interested in providing premises in which an on-sale business is to be operated, will not ordinarily commence the construction of such facilities without prior assurance of having a license for its operation. Without it the financing of such facility becomes difficult, if not impossible. Aware of this situation it has, for many years, been the established policy of the Department of Revenue in such circumstances to approve the issuance of the license and hold it until conforming premises are provided.

Since such practice is not contrary to our statutes we hold it to be a proper procedure. However the contemplated premises must be made available within a reasonable time. If they are not, the bona fides of the applicant is in question rendering the license subject to cancellation. In other words, it must be a good faith application. During the time the license is being held by the Commissioner it is an "issued" license, but the licensee may not operate under it until the contemplated premises are provided at the place stated in the application, and determined to be proper.

■ The other ground for his claim that the Chamales on-sale license should not be charged against the quota is based on the fact that he had been issued a Q license expiring December 31, 1971. Chap. 211, Laws of 1971 repealed Chap. 206, Laws of 1970, the bottle club act, but it gave such licensees the protection of on-sale licenses. In the part of it here material and now appearing as SDCL 35-1-5.2, it declared:

"Any person holding an on-sale dealer's retail license of any of the existing classes or holding a Class Q license issued under the provisions of SDCL 35-4-2(17) on July 1, 1971 shall be entitled to be issued an on-sale license

from the appropriate governing board having jurisdiction, upon application to the governing board for an on-sale license within appropriate classifications established."

Asmussen contends that this provision, in effect, converted Chamales' Q license into an on-sale license which was not within the provisions of SDCL 35-4-11, the quota section. The trial court did not share this view. We do.

While the statute does not say so expressly, we think that was its intent. Sec. 8 of Chàp. 206, Laws of 1970, which brought the bottle club feature into our law, expressly provided that the number of class Q licenses issued thereunder was to be determined on a basis other than the general statute providing for quotas based on population. Consequently, we incline to the view this was the legislative intent in the enactment of SDCL 35-1-5.2. To hold otherwise would render the expected protection of their preferred status virtually meaningless. The investment made by the Q licensees who had been permitted only one year of operation would be pretty much lost. We are persuaded the purpose of this provision was to avoid that harsh result. Protecting existing licensees is a common provision in liquor legislation.

■ The Kelso-McDaniels application was denied on December 7, 1971. In holding invalid its approval by the City of Pierre on May 2, 1972 the trial court relied on that part of SDCL 35-2-5.1, which provides:

"No further application shall be received from a person until after the expiration of one year from the date of a refused application."

In their behalf, it is urged that the May 2 hearing was only a reconsideration of the original application and not of a further application. This position ignores reality. The original application was amended by the accompanying contract. In place of Kelso-McDaniels as the prospective licensees it substituted their assignee. Even though it appears he was more desirable as a

licensee than they, nevertheless it altered the application substantially. This material change made it a further application which the city had no right to consider at that time.

The legislature has expressly declared that no license to sell intoxicating beverages at retail shall be granted except after hearing upon the required notice. SDCL 35-2-3. The Notice must state the time and place where the application will be considered and state that any person interested in its approval or rejection may appear and be heard. SDCL 35-2-5. One obvious purpose of the notice was to let interested persons know who the prospective licensees were. See also SDCL 35-2-4. To accept their position would defeat the manifest legislative desire to give such members of the general public notice of these applications.

The weakness of their position is obvious from the provisions of SDCL 35-2-7, which require that when a license is transferred to another person the transferee "must make an application exactly as if an original applicant, and such application shall take the same course and be acted upon as if an original application." The requirement is similar when the license is sought to be transferred to a new location. Why should less be required when the transfer of a license to another person is attempted in anticipation of its issuance?

While we hold that the Commissioner should act on Asmussen's application, in view of the fact the record discloses that after his application was filed Kelso and McDaniels were also seeking a similar license for the same premises, he should be required to show that he is the owner or actual lessee of the premises where he proposes to operate at 406 South Pierre Street before the license he seeks is granted to him. This is the requirement of SDCL 35-2-6.3.

The part of the judgment holding that the Commissioner properly refused to act on Asmussen's application is reversed. The other portions are affirmed.

HANSON, P. J., and BIEGELMEIER and DOYLE, JJ., concur.

WOLLMAN, J., concurs in part, dissents in part.

RENTTO, Retired Judge, sitting for WINANS, J., disqualified.

WOLLMAN, Judge (concurring in part, dissenting in part).

I concur in the majority opinion except for the holding that the Commissioner should act on Asmussen's application.